1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

SOUTHERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| GREGORY A. BROUCKAERT,<br><br>                              Plaintiff,<br><br>    v.<br><br>CAROLYN W. COLVIN,<br>Acting Commissioner of Social Security,<br><br>                              Defendant. | Civil       13-cv-01486 BAS (BGS)<br>No.<br><br>**REPORT AND RECOMMENDATION: DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT.**<br><br>   **(Doc. Nos. 10 and 15-1.)** |

11
12
13
14
15
16
17
18

## I. INTRODUCTION

19
20

On June 27, 2013, Gregory A. Brouckaert ("Brouckaert") filed a complaint pursuant to the Social Security Act ("Act"), 42 U.S.C. § 405(g), challenging the Commissioner of the Social Security Administration's ("Commissioner") denial of disability benefits.  (Doc. No. 1.)  On September 19, 2013, the Commissioner filed an answer.  (Doc. No. 7.)  On October 25, 2013, Brouckaert filed a motion for summary judgment, requesting reversal of the Administrative Law Judge's ("ALJ") final decision. (Doc. No. 10.)  Specifically, Brouckaert seeks reversal of the ALJ's denial or, in the alternative, remand for further administrative proceedings on the basis that the ALJ failed to articulate clear and convincing reasons for rejecting Brouckaert's testimony.  (*Id.*)

21
22
23
24
25
26
27

On January 9, 2014, the Commissioner filed a cross-motion for summary judgment

28

1

1  and a response in opposition to Brouckaert's motion. (Doc. Nos. 15-1 and 16.) The

2  Commissioner argues that the ALJ's decision was supported by substantial evidence, free

3  from legal error, and should be affirmed. (Doc. No. 15-1.)

4     Pursuant to Civ. L.R. 7.1(d)(1), the Court finds the parties' cross-motions suitable

5  for decision on the papers and without oral argument. After careful consideration of the

6  administrative record and the applicable law, the Court recommends that Brouckaert's

7  motion for summary judgment be **DENIED** and that Commissioner's cross-motion for

8  summary judgment be **GRANTED**.

9           **II. LEGAL STANDARDS FOR DETERMINATION OF DISABILITY**

10    In order to qualify for disability benefits, an applicant must show that: (1) he or

11 she suffers from a medically determinable physical or mental impairment that can be

12 expected to result in death, or that has lasted or can be expected to last for a continuous

13 period of not less than twelve months; and (2) the impairment renders the applicant

14 incapable of performing the work that he or she previously performed or any other

15 substantially gainful employment that exists in the national economy. *See* 42 U.S.C.    §

16 423(d)(1)(A), (2)(A). An applicant must meet both requirements to be "disabled." *Id.*

17 The applicant has the burden to establish disability. *Terry v. Sullivan*, 903 F.2d 1273,

18 1275 (9th Cir. 1990).

19    The Secretary of the Social Security Administration set forth a five-step sequential

20 evaluation process for determining whether a person has established his or her eligibility

21 for disability benefits. *See* 20 C.F.R. §§ 404.1520, 416.920. The five steps in the process

22 are as follows:

23    1. Is the claimant presently working in a substantially gainful activity? If so,
      then the claimant is not disabled within the meaning of the Social Security
24    Act. If not, proceed to step two. *See* 20 C.F.R. §§ 404.1520(b), 416.920(b).

25    2. Is the claimant's impairment severe? If so, proceed to step three. If not,
      then the claimant is not disabled. *See* 20 C.F.R. §§ 404.1520©, 416.920©.
26
27    3. Does the impairment "meet or equal" one or more of the specific
      impairments described in 20 C.F.R. Pt. 404, Subpt. P, App. 1? If so, then the
      claimant is disabled. If not, proceed to step four. *See* 20 C.F.R.
28    §§ 404.1520(d), 416.920(d).

4. Is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled. If not, proceed to step five. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

5. Is the claimant able to do any other work? If so, then the claimant is not disabled. If not, then the claimant is disabled. *See* 20 C.F.R. §§ 404.1520(f), 416.920(f).

*Bustamante v. Massanari*, 262 F.3d 949, 954 (9th Cir. 2001).

In steps one through four, the claimant bears the burden of proof to establish that he is disabled. *Smolen v. Chater*, 80 F.3d 1273, 1289 (9th Cir. 1996); *see Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007) (finding that the claimant bears the burden "to establish [his] entitlement to disability insurance benefits" at all times). At step five, the Commissioner bears the burden of proof to demonstrate that the claimant is not disabled. *See Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 689 (9th Cir. 2009) (stating that the burden shifts to the Commissioner at step five to show that claimant can do other kinds of work). The Commissioner must show that the claimant can perform other work that exists in significant numbers in the national economy by "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999); *see also* 20 C.F.R. § 404.1566 (describing "work which exists in the national economy"). If the Commissioner meets this burden, then the claimant is not disabled. *Bustamante*, 262 F.3d at 954. However, if the Commissioner fails to meet this burden, then the claimant is disabled. *Id*.

## III. BACKGROUND

Brouckaert filed a Tile II application for a period of disability and disability insurance benefits on December 18, 2010,[1] alleging disability beginning September 21, 2010. (Doc. No. 8-2 at 15; Doc. No. 8-3 at 10.) Brouckaert's application alleged disability due to: (1) "cervical spine numbness tingling pin [sic] in neck and shoulder;" (2) "cervical spine;" (3) "tingling and pain in neck, shoulders, upper back;" (4) "tingling

---

[1] Brouckaert's motion for summary judgment states Brouckaert filed his application on December 20, 2010. (Doc. No. 10 at 3.) However, the ALJ's decision and the administrative record indicate that Brouckaert filed his application on December 18, 2010. (Doc. No. 8-2 at 15; Doc. No. 8-3 at 10, 20.) As such, the Court shall reference the application as commencing on December 18, 2010, not December 20, 2010.

and pain in left arm, hand and chest;" (5) "constant pain in lower left back;" and (6) "shooting pain down both legs." (Doc. No. 8-3 at 2, 11-12.) The Social Security Administration ("SSA") denied Brouckaert's application on March 30, 2011. (Doc. No. 8-4 at 2.) On April 13, 2011,[2] Brouckaert requested reconsideration of his application. (*Id.* at 7.) The SSA denied reconsideration on May 20, 2011. (*Id.* at 8.) Subsequently, on June 13, 2011,[3] Brouckaert requested a hearing before an ALJ. (*Id.* at 14.) On January 23, 2012, the ALJ Gary J. Lee held a video hearing in San Francisco, California. (Doc. No. 8-2 at 70.) Brouckaert appeared in Bakersfield, California, represented by Diana Wade, a non-attorney representative. (*Id.*; Doc. No. 8-4 at 16.) Michael Goldhamer, an impartial medical expert ("ME"), Herbert M. Tanenhaus, an impartial psychological expert ("PE"), and Nancy A. Rynd, an impartial vocational expert ("VE"), also appeared and testified. (Doc. No. 8-2.)

**A.    Relevant Medical Records Submitted to ALJ for Review**

    **1.    Degenerative Disc Disease**

        **i.    Medical Records from Kaiser Permanente**

On September 21, 2010, Brouckaert saw Dr. Don Alan Paxton for the first time at the Discovery Plaza Medical and Administrative Offices for persistent pain in his posterior neck, left shoulder, and left arm that ranged from mild to moderate levels in severity. (Doc. No. 8-7 at 55.) Dr. Paxton diagnosed Brouckaert with cervical radiculopathy as the "primary encounter diagnosis." (*Id.* at 59-60, 65-66.) Brouckaert informed Dr. Paxton that "he prefers to continue conservative therapy with medication," and "he is also not interested in surgical referral." (*Id.* at 60, 65.) During this first visit,

---

[2] Brouckaert's motion for summary judgment states Brouckaert requested reconsideration of his application on April 14, 2011. (Doc. No. 10 at 3.) However, the administrative record indicates that Brouckaert requested reconsideration on April 13, 2011. (Doc. No. 8-4 at 7.) As such, the Court shall reference the reconsideration of Brouckaert's application as commencing on April 13, 2011, not April 14, 2011.

[3] Brouckaert's motion for summary judgment states Brouckaert requested a hearing before an ALJ on June 14, 2011. (Doc. No. 10 at 3.) However, the ALJ's decision and the administrative record indicate that Brouckaert requested a hearing on June 13, 2011. (Doc. No. 8-2 at 15; Doc. No. 8-4 at 14.) As such, the Court shall reference Brouckaert's request for hearing as commencing on June 13, 2011, not June 14, 2011.

1  Dr. Paxton prescribed nortriptyline 25 mg for improvements in sleep and pain and

2  informed Brouckaert to continue taking hydrocodone-acetaminophen ("NORCO")

3  10-325 mg for pain.  (*Id.* at 65, 68.)

4  Dr. Paxton's progress note from this first visit included an analysis of a magnetic

5  resonance imaging (MRI) test of Brouckaert's cervical spine from September 7, 2010.

6  (*Id.* at 56-58, 61-63.)  The analysis concluded that Brouckaert had:  (1) "mild to moderate

7  degenerative and spondylotic changes from C3-4 through C6-7;" (2) "multilevel

8  degenerative stenoses from C3-4 through C6-7" and "small disc protusions at C3-4, C4-5,

9  and C6-7 contributing to stenoses;" and (3) "mild associated cord flattening at C6-7,

10  C5-6, and to a lesser extent C4-5, related to stenoses and disc protusions," and (4) "no

11  abnormal intramedullary signal identified to suggest myelomalacia or cord edema."  (*Id.*

12  at 57.)

13  On December 30, 2010, Brouckaert saw Dr. Paxton for back pain.  (*Id.* at 35.)

14  After conducting a physical exam, Dr. Paxton observed that Brouckaert exhibited

15  decreased range of motion and tenderness with no spasm in his cervical back.  (*Id.* at 38,

16  43.)  Dr. Paxton also observed that Brouckaert exhibited tenderness and normal range of

17  motion in his lumbar back.  (*Id.*)  Dr. Paxton diagnosed Brouckaert with Mechanical Low

18  Back Pain.  (*Id.* at 45.)  Brouckaert informed Dr. Paxton "he did not want referral to a

19  surgeon or a pain intervention," but "he prefers medication management."  (*Id.* at 35, 44.)

20  At this visit, Dr. Paxton continued to prescribe NORCO and adjusted nortriptyline to 50

21  mg due to the benefits Brouckaert experienced from them.  (*Id.* at 39, 44.)  Moreover, Dr.

22  Paxton prescribed Morphine Sulfate Controlled-Release ("MSContin") 15 mg for his

23  chronic, non-malignant pain.  (*Id.*)

24  On April 26, 2011, Brouckaert saw Dr. Paxton again for back pain.  (*Id.* at 86, 92.)

25  Dr. Paxton noted that Brouckaert's symptoms at his neck have improved due to

26  nortriptyline.  (*Id.*)  Moreover, Brouckaert reported that his symptoms are stable with the

27  use of MsContin and nortriptyline.  (*Id.* at 90, 96.)  After conducting a physical exam, Dr.

28  Paxton observed that Brouckaert exhibited decreased range of motion and tenderness and

exhibited no spasm in his cervical back.  (*Id.* at 89, 95.)  Dr. Paxton also observed that Brouckaert exhibited tenderness and normal range of motion in his lumbar back.  (*Id.*)  Dr. Paxton diagnosed Brouckaert with the following diagnoses relevant to his degenerative disc disorder:  (1) "spinal stenosis of cervical region;" (2) "degeneration of cervical intervertebral disc;" (3) "degeneration of lumbosacral intervertebral disc;" and (4) "mechanical low back pain."  (*Id.* at 97.)  Brouckaert again informed Dr. Paxton that "he is not interested in surgical intervention or pain intervention at the cervical spine."  (*Id.* at 90, 96.)  Dr. Paxton informed Brouckaert to continue NORCO, nortriptyline, and increased MSContin from 15 mg to 30 mg.  (*Id.*)

On September 15, 2011, Brouckaert visited Dr. Paxton for back and leg pain.  (*Id.* at 101, 108.)  Dr. Paxton observed that Brouckaert's posterior neck pain has largely resolved.  (*Id.*)  Brouckaert reported that his lower back pain with extension to the buttocks are moderate.  (*Id.* at 102, 108.)  Moreover, Brouckaert reported resolution of his radicular symptoms with the use of nortriptyline.  (*Id.*)  Brouckaert denied side effects to both MSContin and NORCO.  (*Id.*)  Dr. Paxton conducted a physical exam and stated Brouckaert exhibited no tenderness and decreased range of motion and pain in his cervical and lumbar back.  (*Id.* at 105, 111.)  Dr. Paxton diagnosed Brouckaert the following diagnoses relevant to his degenerative disc disorder:  (1) "chronic pain;" (2) "degeneration of lumbosacral intervertebral disc;" (3) "degeneration of cervical intervertebral disc;" and (4) "spinal stenosis."  (*Id.* at 113.)  Dr. Paxton continued to prescribe MSContin but discontinued NORCO for therapy change and instead prescribed Morphine Sulfate Immediate Release ("MSIR") 30 mg.  (*Id.* at 115.)

In addition, during this visit, Dr. Paxton filled out a Doctor's Certification of Disability for Brouckaert to submit to the department of motor vehicles ("DMV").  (*Id.* at 158.)  Dr. Paxton stated Brouckaert should get a temporary placard for his vehicle till February 10, 2012 because Brouckaert has degenerative disc disorder and lumbar spine that impair or interfere his mobility.  (*Id.* at 158.)  Subsequently, DMV issued the disabled person placard on November 1, 2011.  (*Id.* at 160.)

On December 5, 2011, Brouckaert revisited Dr. Paxton for back pain.  (Doc. No. 8-8 at 15.)  After conducting a physical exam, Dr. Paxton stated Brouckaert exhibited pain but he exhibited normal range of motion and no tenderness in the cervical back.  (*Id.* at 19.)  Moreover, Brouckaert exhibited decreased range of motion and pain and no tenderness in the lumbar back.  (*Id.* at 19.)  Dr. Paxton diagnosed Brouckaert with radicular pain.  (*Id.* at 25.)  Dr. Paxton observed that Brouckaert received benefits for his back pain from MSContin and NORCO.  (*Id.* at 15-16.)  Brouckaert denied side effects to these medications.  (*Id.* at 16.)  Moreover, Brouckaert's radicular symptoms have been resolved due to nortriptyline.  (*Id.*)

### ii.    Physical/Occupational Therapy Records from Sequoia Physical Therapy

On September 15, 2011, Dr. Paxton referred Brouckaert to physical therapy with the diagnoses of Degenerative Disc Disorder and lumbar spine.  (Doc. No. 8-8 at 32.)  Brouckaert visited Sequoia Physical Therapy for the first time on September 28, 2011.  (*Id.* at 36.)  Subsequently, he received physical therapy on October 3, 6, 11, 13, 17, 21, 26, 28, and 31 of 2011.  (*Id.* at 37-38.)  Brouckaert's physical therapy treatments consisted of "moist heat, TENS, ultrasound, lumbar and abdominal flexibility and strengthening exercises 3X/WK for 4 WKS with goals to decrease pain, increase flexibility, increase ROM, increase strength and increase functional activities."  (*Id.* at 40.)

### iii.    Function Report

On December 5, 2011, Brouckaert filed a Function Report to his Social Security Disability Advocate, Diana Wade.  (Doc. No. 8-7 at 163-69.)  The report contained information regarding his basic information, conditions, daily activities, and abilities.  (*Id.*)  In the report, Brouckaert stated that his conditions limit his ability to work because his symptoms and pain have led to limitations in moving his head and neck, sitting for extended periods, and walking.  (*Id.* at 163.)  He alleged his symptoms prevent him from "carrying out a normal workday."  (*Id.*)

Brouckaert expounded that from the time wakes up until the time he goes to bed, he:  (1) takes his dog outside and feeds his dog; (2) spends 20 to 30 minutes on flexibility exercises in the morning and evening; (3) reads the bible for 30 to 40 minutes; (4) reads the newspaper; (5) researches and checks e-mails on the internet; (6) drives to medical appointment in Bakersfield; (7) goes to doctor's appointments once or twice per week; (8) drives about 20 to 25% of the time; (9) watches television; (10) performs household chores by rinsing the dishes and placing them in the dishwasher; (11) sits while using the TENS unit; (12) checks the fluid levels and tire pressures of his cars weekly; (13) shops in stores and online; (14) handles his finances; (15) attends church weekly; and (16) gets together with friends for dinner two or three times per month.  (*Id.* at 163-67.)

He further stated he experienced various side effects [4] from nortriptyline nd morphine sulfate.[5]  (*Id.* at 168.)  Brouckaert reported that medications do not eliminate his discomfort, and the pain, numbness, and tingling never completely subsided.  (*Id.*)

### iv.    Medical Records from  Kern Radiology Medical Group

On December 30, 2011, Brouckaert had an MRI of his lumbar spine at the Kern Radiology Medical Group.  (Doc. No. 8-8 at 44-45.)  Dr. John M. Gundzik stated in the MRI report that there was an indication of low back pain.  (*Id.* at 44.)  Moreover, Dr. Gundzik found that there were:  (1) "no immediate paraspinal mass or adenopathy identified" in the paraspinal area; (2) "mild multilevel degenerative endplate signal changes and straightening of lumbar lordosis" in the bones; (3) "normal caliber, contour, location and signal intensity" in the cord/cauda equina; and (4) "diffuse congenital narrowing of the lumbar spinal canal from short pedicles."  (*Id.*)

Dr. Gundzik concluded that Brouckaert had:  (1) "mild diffuse degenerative and

---

[4]  Brouckaert also stated he experienced side effects from Terazosin and Simvastatin; however, these medications were not prescribed to treat his degenerative disc disorder.  (Doc. No. 8-7 at 84, 98.)

[5]  On his own self-reporting Function Report, Brouckaert stated his side effects for nortriptyline were drowsiness, mental confusion, disorientation, strange dreams, dry mouth, heartburn, weight gain, blurred vision, mood swings, anxiety, and restlessness; and his side effects for morphine sulfate were drowsiness, confusion, restlessness, sweating, constipation, hallucinations, and swollen legs.  (*Id.* at 168.)

spondylotic changes;" (2) "moderate canal stenosis and mild bilateral foraminal stenosis stenosis at L2-3, L3-4, and L4-5;" and (3) "underlying congenital canal narrowing contributing to aforementioned stenoses."  (*Id.*)

### 2.   Type II Diabetes

#### i.   Medical Records from Kaiser Permanente

On September 21, 2010, Dr. Paxton reported Diabetes mellitus type 2 ("DM 2") as one of Brouckaert's active problems.  (Doc. No. 8-7 at 58, 63.)  Brouckaert continued to struggle with DM 2.  (Doc. No. 8-7; Doc. No. 8-8.)  During Brouckaert's last visit to Dr. Paxton on December 5, 2011, Dr. Paxton again listed DM 2 as one of Brouckaert's active problems.  (Doc. No. 8-8 at 24.)

### 3.   Obesity[6]

#### i.   Medical Records from Kaiser Permanente

On September 21, 2010, Brouckaert's weight of 251 pounds and height of 6'1 put Brouckaert's body mass index (BMI) at 33.1.[7]  (Doc. No. 8-7 at 59.)  At Brouckaert's last visit to Dr. Paxton on December 5, 2011, Dr. Paxton reported an increase in Brouckaert's BMI.  (Doc. No. 8-8 at 19, 24.)  Brouckaert's weight of 267 pounds and height of 6'1 put Brouckaert's BMI at 35.2.  (*Id.*)

## B.   Wife's Statement

On January 22, 2012, Brouckaert's wife, Meldoy Brouckaert, submitted a letter to the ALJ to support Brouckaert's alleged debilitations.  (Doc. No. 8-6 at 56.)  She stated that Brouckaert "is in pain all day long regardless of what he does, even when he's doing nothing.  The shooting pains come and go during the day and also wake him up in the middle of the night . . . The medications he takes to relieve his pain do not help as much as he'd like them to.  They cause him to be dopey and mainly cause him memory loss.

---

[6] Brouckaert did not allege obesity as one of his impairments when applying for his disability insurance benefits.  (Doc. No. 8-3 at 5, 15.)  However, the ALJ has considered Brouckaert's condition of obesity.  (Doc. No. 8-2 at 17.)

[7] A BMI between 25 and 29.9 is considered overweight, and a BMI of 30 or higher is considered obese.  (Doc. No. 8-7 at 52.)

1   He is able to function somewhat around the house, but not like he used to.  Because of the

2   constant pain and mental confusion, there is no way he could function at a job, regardless

3   of what the duties were for him to do." (*Id.*)

4   **C.   Hearing Testimony**

5        Brouckaert was 60-years-old at the time of the hearing.  (Doc. No. 8-5 at 2.)

6   Brouckaert testified that his last day of work was on September 21, 2010.  (Doc. No. 8-2

7   at 71-72.)  Brouckaert stated that he and his wife owned an insurance business.  (*Id.* at 72,

8   84.)  However, he closed his business on July 30, 2010 due to pain, not economic

9   reasons.  (*Id.* at 84.)  Subsequently, Brouckaert started to work full time at Howard

10   Financial.  (*Id.* at 85.)  However, Brouckaert decided to stop working because "the pain

11   became so great that [he] couldn't do [his] normal daily functions." (*Id*. at 72.)  The ALJ

12   asked Brouckaert whether he tried to find other types of jobs that might be consistent

13   with the pain and limitations that he suffered from.  (*Id.*)  Brouckaert responded that in

14   November 2010 and the summer of 2011, he applied for mortgage loan officer positions;

15   however, he was not hired for either position.  (*Id.*)  Brouckaert testified that, in

16   hindsight, he felt that he could not have performed those duties because "sitting in place

17   for an extended period of time provides a great deal of pain." (*Id.* at 73.)

18        When the ALJ asked Brouckaert about his pain and symptoms from the time he

19   stopped working, Brouckaert stated "the pain has gotten progressively worse over the

20   months." (*Id.*)  Brouckaert testified that he experienced:  (1) pain in his neck and

21   shoulder area when he turned his head; (2) numbness that ran from his chin to his chest,

22   left shoulder blade, arm, and hand; (3) lumbar back pain; (4) "back spasms" that "shoots

23   out in all directions" especially down his buttocks and both of his legs; (5) numbness and

24   burning sensation in his left hip, leg, and foot when he sits or stands too long in one

25   position.  (*Id.*)

26        Furthermore, when Brouckaert's representative asked Brouckaert about his pain

27   and symptoms, Brouckaert testified that he cannot stand, pull, lift without a great deal of

28   pain.  (*Id.* at 83.)  Brouckaert stated he is unable to function fully and has to lay in his

1  recliner anywhere from four to eight times a day.  (*Id.* at 83-84.)  He would spend at least
2  15 to 20 minutes on the recliner each time.  (*Id.*)

3        Brouckaert testified that he currently takes medications prescribed by Dr. Paxton at
4  Kaiser in Bakersfield.  (*Id.* at 75.)  He takes nortriptyline, morphine sulfate three times a
5  day, and previously, hydrocodone, to relieve his pain.  (*Id.*)  The ALJ asked Brouckaert
6  whether Dr. Paxton suggested any other form of treatment.  (*Id.* at 76.)  Brouckaert
7  replied that Dr. Paxton suggested him to consult with a neurosurgeon regarding a back
8  surgery.  (*Id.*)  Brouckaert met with a neurosurgeon and took an MRI.  (*Id.*)  However,
9  Brouckaert stated he was not able to discuss the results of his MRI with a neurosurgeon
10  because he moved from Bakersfield to San Diego and was not able to get a referral to a
11  neurosurgeon in San Diego.  (*Id.*)

12        The ME, Michael Goldhamer, also testified.  (*Id.* at 78.)  The ME testified that
13  based on the medical evidence of record, Brouckaert suffered from impairments, but
14  these impairments, either singularly or in combination, do not meet or equal any of the
15  listings of impairments listed in 20 CFR Part 404, Subpart P, Appendix 1.[8]  (*Id.* at 79.)
16  The ME listed the following impairments:  (1) "chronic low back pain secondary to
17  degenerative joint disease in the lumbar spine;" (2) "mid to moderate degenerative joint
18  disease in the cervical spine with mild disk [sic] protusion from C3 through C7;" and (3)
19  "well controlled Type II diabetes mellitus."  (*Id.*)

20        The ALJ asked the ME to render a residual functional capacity ("RFC") regarding
21  Brouckaert's functional limitations.  (*Id.*)  As such, based on the medical evidence of
22  record, the ME suggested that Brouckaert:

23      "[C]an occasionally lift 20 pounds; frequently lift 10 pounds.  He can stand and/or
    walk about six hours in an eight-hour day, and he could sit with normal breaks for
24      a total of six hours in an eight-hour day.  Pushing and pulling would be unlimited
    except as previously mentioned.  There would be some postural limitations.  He
25      could frequently climb a ramp or stairs.  He could never climb a ladder, rope, or
    scaffolds.  He could occasionally balance, stoop, kneel, crouch, and crawl . . ."
26  (*Id.* at 79-80.)

27  
28        [8] At Step Three, the ALJ decides whether the impairment "meets or equals" one or more
    of the specific impairments described in 20 C.F.R. Pt. 404, Subpt. P, App. 1. If it does, then the
    claimant is disabled. If it does not, the ALJ proceeds to step four.  *See* 20 C.F.R.

Next, Brouckaert's representative questioned the ME.  (*Id.* at 80.)  Brouckaert's representative asked the ME whether Brouckaert had symptoms of sciatica in light of his MRI and the CT of the lumbar spine.  (*Id.*)  The ME responded "no" according to the lumbar MRI.[9]  (*Id.*)  Moreover, the ME opined that Brouckaert's symptoms are consistent with degenerative joint disease in his spine.  (*Id.* at 81.)  The ME opined that he did not read anything in the X-rays or MRI that would keep Brouckaert from working a full-time job.  (*Id.*)

The PE, Herbert M. Tanenhaus, also testified.  (*Id.* at 82.)  The PE testified that based on the record's evidence of diagnosis of treatment, he did not find any medically determinable mental impairments Brouckaert suffers from.  (*Id.*)  The PE stated that the nortriptyline Brouckaert "is receiving for pain is an old medicine for depression, but it was given at higher doses than [he] receives it now for pain."  (*Id.*)

Lastly, the ALJ called the VE, Nancy Rynd, to testify.  (*Id.* at 85.)  The VE testified that Brouckaert engaged in three areas of employment in the past 15 years:  (1) financial advisor, defined as sedentary work with a Specific Vocational Preparation[10] ("SVP") of 8; (2) mortgage loan officer, defined as sedentary work with an SVP of 6; and (3) vice president in the banking industry, defined as sedentary work with an SVP of 8.  (*Id.* at 86.)  The ALJ asked the VE to consider a hypothetical claimant of Brouckaert's age, educational background, and prior work experiences who is capable of performing exertional demands of light work and has non-exertional limitations.  (*Id.* at 86-87.)  The ALJ asked whether the hypothetical claimant can perform his past relevant work with such limitations.  (*Id.*)  The VE answered "yes" to the ALJ's hypothetical.  (*Id.* at 87.)  Next, the ALJ asked the VE whether missing work twice a month or requiring a use of

---

[9] Both the ALJ and the ME were not able to locate the CT scan of the lumbar spine in the record.  (Doc. No. 8-2 at 78.)

[10]Specific Vocational Preparation is defined in Appendix C of the Dictionary of Occupational Titles as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  An SVP of 8 contemplates over 4 years up to and including 10 years of training.  See Dictionary of Occupational Titles (4th Ed., Rev. 1991) - Appendix C. Washington, DC: U.S. Government Printing Office.

recliner will allow Brouckaert to perform his past relevant work.  (*Id.*)  The VE opined that "missing work twice on a continual basis eventually would preclude [Brouckaert] from competitive employment."  (*Id.*)  Moreover, requiring a use of recliner will not allow him to perform his past relevant work because the work is highly skilled and requires the ability to maintain attention.  (*Id.*)

**D.     ALJ's Findings**

On January 27, 2012, the ALJ issued his decision denying Brouckaert disability insurance benefits.  (*Id.* at 12.)  In arriving at his decision, the ALJ applied the Commissioner's five-step sequential disability determination process set forth in 20 C.F.R. § 404.1520, as described in Section Two of the instant Report and Recommendation.  At step one, the ALJ found that Brouckaert had not engaged in substantial gainful activity during the relevant period.  (*Id.* at 17.)  Accordingly, the ALJ found that Brouckaert satisfied step one.  (*Id.*)

At step two, the ALJ found that Brouckaert suffered from severe impairments:   (1) degenerative disc disease and (2) type II diabetes.  (*Id.*)  Moreover, the ALJ considered Brouckaert's condition of obesity.  (*Id.*)  The ALJ stated that obesity is not an impairment; however, he considered obesity's potential effects in causing or contributing to Brouckaert's impairments.  (*Id.*)  Thus, with regard to Brouckaert's listed severe impairments, the ALJ found that Brouckaert satisfied step two.  (*Id.*)

At step three, the ALJ found that Brouckaert did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments under medical listing 1.04 and 6.02. (*Id.* at 18.)  The ALJ, therefore, proceeded to step four.  (*Id.*)

At step four, the ALJ determined that Brouckaert's impairments did not affect his ability to perform past work.  (*Id.* at 18.)  The ALJ prepared a Residual Functional Capacity assessment ("RFC"), which "is used at step four of the sequential evaluation process to determine whether an individual is able to do past relevant work," *See* 20 C.F.R. § 404.1545(a)(1) (defining an  RFC as "the most [a claimant] can still do despite

[his or her] limitations.") Specifically, the ALJ found Brouckaert had the RFC to perform a full range of sedentary work as defined in 20 C.F.R. § 404.1567(a) because while Brouckaert's "medically determinable impairments could reasonably be expected to cause the alleged symptoms . . . the claimant's statements, and those of his wife, concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the ... residual functional capacity assessment." (Doc. No. 8-2 at 18-19.) As support for discounting Brouckaert's statements and consequently preparing an RFC to perform a full range of sedentary work, the ALJ relied on inconsistencies between Brouckaert's statements and his demonstrated "activity level, objective clinical and diagnostic findings and treatment records." (*Id*. at 20.)

The ALJ also considered opinion evidence to discredit Brouckaert's statements regarding the intensity and effect of his symptoms. (*Id.* at 20-21.) The ALJ gave "great weight" to Dr. Goldhamer's opinion that Brouckaert's medically determinable impairments "do not singly or in combination meet or equal a medical listing" and Brouckaert "could perform sustained full time work on a sedentary basis." (*Id.* at 20.) Additionally, the ALJ gave "great weight" to Dr. Tanenhaus's opinion that "he did not find any evidence of diagnosis or treatment of a mental condition." (*Id.*) Finally, the ALJ gave "significant weight" to Dr. Paxton, who filled out a certification of disability stating Brouckaert "has a disorder which impairs his mobility, and he should get a temporary placard for his vehicle through the department of motor vehicles." (*Id.* at 21.)

Finally, the ALJ considered the VE's testimony to determine that Brouckaert is capable of performing past relevant work as a financial advisor, mortgage loan officer, and vice president of a bank. (Doc. No. 8-2 at 21.) Specifically, the ALJ found that these types of work do not require the performance of work-related activities precluded by Brouckaert's RFC. (*Id.*) In fact, these types of work require activities that are consistent with Brouckaert's RFC. (*Id.*) Thus, the ALJ concluded that Brouckaert "has not been under disability, as defined in the Social Security Act, from September 21, 2010, through

1   the date of this decision." (*Id.*)  Because the ALJ found Brouckaert was able to do work

2   he has done in the past, the ALJ did not proceed to step five.  *See* 20 C.F.R. §§

3   404.1520(e), 416.920(e).

4          On March 16, 2010 Brouckaert appealed the ALJ's decision to the Appeals

5   Council.  (*Id.* at 11.)  The Appeals Council denied Brouckaert's request for review.  (*Id.*

6   at 4.)

7                            **IV. SCOPE OF REVIEW**

8          Section 205(g) of the Social Security Act allows unsuccessful applicants to seek

9   judicial review of a final agency decision.  42 U.S.C. § 405(g).  The scope of judicial

10   review is limited.  *See id*.  This Court has jurisdiction to enter a judgment affirming,

11   modifying, or reversing the Commissioner's decision.  *See id*.; 20 C.F.R. § 404.900(a)(5).

12   The matter may also be remanded to the Social Security Administration for further

13   proceedings.  42 U.S.C. § 405(g).

14          The Commissioner's decision must be affirmed upon review if it is:  (1) supported

15   by "substantial evidence" and (2) based on proper legal standards.  *Uklov v. Barnhart*,

16   420 F.3d 1002, 1004 (9th Cir. 2005).  If the Court, however, determines that the ALJ's

17   findings are not supported by substantial evidence or are based on legal error, the Court

18   may reject the findings and set aside the decision to deny benefits.  *Aukland v.*

19   *Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001).  Substantial evidence is more than a

20   scintilla but less than a preponderance.  *Connett v. Barnhart*, 340 F.3d 871, 873 (9th Cir.

21   2003).  It is "relevant evidence that, considering the entire record, a reasonable person

22   might accept as adequate to support a conclusion."  *Id*.; *see also Howard ex rel. Wolff v.*

23   *Barnhart*, 341 F.3d 1006, 1012 (9th Cir. 2003) (finding substantial evidence in the record

24   despite the ALJ's failure to discuss every piece of evidence).  Moreover, "where evidence

25   is susceptible to more than one rational interpretation," the ALJ's conclusion must be

26   upheld.  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).  This includes deferring to

27   the ALJ's credibility determinations and resolutions of evidentiary conflicts.  *See Lewis v.*

28   *Apfel*, 236 F.3d 503, 509 (9th Cir. 2001).  Nevertheless, the Court "must consider the

1  entire record as a whole and may not affirm simply by isolating a specific quantum of

2  supporting evidence." *Robbins v. Soc. Sec. Admin*., 466 F.3d 880, 882 (9th Cir. 2006).

3  **V. DISCUSSION**

4  In the instant motion, Brouckaert argues that the ALJ erred in failing to articulate

5  clear and convincing reasons for rejecting his testimony.  (Doc. No. 10 at 4.)  Therefore,

6  Brouckaert contends that the Court should find his testimony to be true.  (*Id.* at 8.)  As

7  such, Brouckaert requests the Court to reverse the ALJ's decision and award benefits to

8  Brouckaert.  (*Id.*)  In the alternative, Brouckaert requests the case be remanded to the ALJ

9  for further administrative proceedings.  (*Id.* at 9.)

10  **A.     The ALJ Properly Discredited Brouckaert's Subjective Complaint Testimony**

11  **        1.     Relevant Law**

12  The ALJ has a "well‑settled role as the judge of credibility."  *Matthews v. Shalala*,

13  10 F.3d 678, 680 (9th Cir. 1993) (quoting *Sample v. Schweiker*, 694 F.2d 639, 642 (9th

14  Cir. 1982)).  Accordingly, the ALJ's assessment of a claimant's credibility and pain

15  severity should be given "great weight."  *Dominguez v. Colvin*, 927 F. Supp. 2d 846, 865

16  (9th Cir. 2003) (citing *Nyman v. Heckler*, 779 F.2d 528, 531 (9th Cir. 1986)).  The ALJ is

17  not "required to believe every allegation of disabling pain, or else disability benefits

18  would be available for the asking, a result plainly contrary to 42 U.S.C.          §

19  423(d)(5)(A)."  *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) (quoting *Fair v.

20  Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)).

21  The Ninth Circuit has established a two-step analysis for the ALJ to evaluate the

22  credibility of a claimant's testimony regarding subjective pain and impairments.  *Vasquez*

23  *v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2008) (citing *Lingenfelter v. Astrue,* 504 F.3d 1028,

24  1035-36 (9th Cir. 2007)).  First, the ALJ must determine whether the claimant presented

25  objective medical evidence of an impairment or impairments that could reasonably be

26  expected to produce the pain or other alleged symptoms.  *Id.*  Second, if the claimant

27  satisfies the first step and there is no affirmative evidence of malingering, the ALJ may

28  reject the claimant's testimony only if he provides "specific, clear and convincing

16

reasons" for doing so.  *Id.*; *see also Parra*, 481 F.3d at 750 (citing *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995)).  These reasons must be "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1224 n. 3 (9th Cir. 2010) (quoting *Smolen*, 80 F.3d at 1284)).

In weighing the credibility of the claimant's testimony, the ALJ may use "ordinary techniques of credibility determination."  *Id.*  The ALJ may consider the "inconsistencies either in his testimony or between his testimony and his conduct, his daily activities, his work records, and testimony from physicians and third parties concerning the nature, severity and effect of the symptoms of which he complains."  *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).

## 2.   Analysis

Brouckaert satisfied the first step of the two-step credibility analysis as the ALJ determined that Brouckaert presented objective medical evidence of medically determinable impairments that could reasonably be expected to cause his alleged symptoms.  (Doc. No. 8-2 at 19.)  The ALJ made no finding that Brouckaert was malingering, nor did any of the presented evidence suggest that he was malingering. Nonetheless, the ALJ found that Brouckaert's statements "concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the" RFC.  (*Id.*)  Therefore, the only remaining issue is whether the ALJ provided "specific, clear and convincing reasons" for rejecting Brouckaert's subjective complaint testimony.  *See Tommasetti*, 533 F.3d at 1039.

The Court finds that the ALJ's decision properly set forth "specific, clear and convincing reasons" supported by substantial evidence in the record for rejecting Brouckaert's subjective complaint testimony to the extent it was inconsistent with the RFC assessment.  (Doc. No. 8-2 at 19.)  The ALJ stated the following reasons for finding Brouckaert's testimony not credible:  (1) the limitations alleged in Brouckaert's testimony were inconsistent with his daily activities; (2) objective clinical and diagnostic

findings did not support the intensity, persistence, and limiting effects of Brouckaert's symptoms; and (3) treatment records did not support the intensity, persistence, and limiting effects of Brouckaert's symptoms.  (*Id.* at 18-21.)  The ALJ's determination that Brouckaert's subjective complaint testimony was not credible is supported by substantial evidence and must be upheld.  The Court will consider the validity of each stated reason.

### i.   Daily Activities

One basis for the ALJ's credibility determination was the inconsistency between Brouckaert's testimony of his alleged limitations and his daily activities which supports the finding that Brouckaert was not credible.  (*Id.* at 18-21); *see Lingenfelter*, 504 F.3d at 1040 (in determining credibility, an ALJ may consider "whether claimant engages in daily activities inconsistent with alleged symptoms").  Daily activities may be grounds for discrediting a claimant's testimony when a claimant "is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting."  *Fair*, 885 F.2d at 603.  Even when such activities suggest some difficulty functioning, the ALJ may discredit a claimant's testimony to the extent that they contradict claims of a totally debilitating impairment.  *See Turner*, 613 F.3d at 1225; *Valentine*, 574 F.3d at 693.

Brouckaert alleged that he was disabled due to: (1) "cervical spine;" (2) "tingling and pain in neck, shoulders, and upper back;" (3) "tingling and pain in left arm, hand and chest;" (4) "constant pain in lower left back;" (5) "shooting pain down both legs;" and (6) "cervical spine numbness tingling pin [sic] in neck and shoulder."  (Doc. No. 8-6 at 10.)  The ALJ noted that despite Brouckaert's alleged limitations, Brouckaert reported inconsistent levels of activity in the Exertional Activities Questionnaire, Function Report, and Medical Evidence of Record.  (*Id.*); *see Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 2007) (finding that daily activity weighs against a finding of credibility when the level of activity is inconsistent with the claimant's claimed limitations); *see Curry v. Sullivan*, 925 F.2d 1127, 1130 (9th Cir. 1991) (holding that an indication that a claimant is able to take care of personal needs, prepare meals, do easy housework, and shop for

groceries can be seen as inconsistent with a condition that precludes all work activity).

Specifically, the ALJ found the following daily activities inconsistent with the limitations

alleged in Brouckaert's testimony:

> "[Brouckaert] is able to go up and down the stairs in his home; he can do light lifting and carrying short distances; he can vacuum; and he can drive (Exhibit 4E). The claimant stated he takes the dog outside and he feeds the dog; he exercises for twenty to thirty minutes a day; he reads his bible and the newspaper daily; he has no problem with his personal care; he prepares meals; he rinses the dishes and puts them in a dishwasher; he checks the fluids on his vehicles weekly; he cleans up after the dog; he does shopping in stores and on a computer; he can handle his finances; he does research on the internet; he goes to church weekly; and he gets together with friends for dinner two to three times a month (Exhibit 7F).  On November 25, 2011, the claimant reported he was in the process of moving and had been cleaning and doing some physical labor on his new condominium (Exhibit 9F, p. 6)."

(Doc. No. 8-2 at 19).

In fact, the ALJ found that Brouckaert's daily activities are consistent with his RFC "to do a full range of sedentary work."  (*Id.* at 21.)  Brouckaert's daily activities indicate that Brouckaert spent a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a sedentary work setting, such as computer research, reading, computation, and occasional walking and light lifting. (*Id.*); *See Burch*, 400 F.3d at 681 (stating that the ALJ may discredit claimant's testimony "if a claimant engages in numerous daily activities involving skills that could be transferred to the workplace").  Accordingly, the ALJ properly found that alleged limitations in Brouckaert's testimony were inconsistent with his daily activities.

### ii.   Objective Clinical and Diagnostic Findings

Another basis for the ALJ's credibility determination was that the objective clinical and diagnostic findings did not support the alleged intensity, persistence, and limiting effects of Brouckaert's symptoms.  (Doc. No. 8-2 at 19-20.)  When the ALJ finds that medically determinable impairments could reasonably be expected to cause a claimant's alleged symptoms, the ALJ may not reject a claimant's testimony solely based on inconsistent medical evidence.  *See Reddick*, 157 F.3d at 722 (finding that an ALJ cannot reject a claimant's testimony simply because it is unsupported by objective medical evidence).  However, in determining a claimant's credibility, inconsistent medical

evidence can be a factor that the ALJ may consider in his credibility analysis. *See*
*Lingenfelter*, 504 F.3d at 1040 (in determining credibility, the ALJ may consider
"whether the alleged symptoms are consistent with the medical evidence").

As previously mentioned, Brouckaert alleged the severity of his impairments in his
application. (Doc. No. 8-6. at 10.)  The ALJ acknowledged that Brouckaert's
impairments "could reasonably be expected to cause the alleged symptoms." (Doc. No.
8-2. at 19.)  However, the ALJ found that the objective clinical and diagnostic findings
did not support the intensity, persistence, and limiting effects of Brouckaert's symptoms.
(*Id*. at 19, 21).  In coming to such conclusion, the ALJ analyzed all the medical records
(Exhibits 1F-6F, 8F-12F). (*Id.* at 19-20).  The ALJ found that:

> "A magnetic resonance imaging (MRI) test of the claimants [sic] cervical spine on
> September 7, 2010 revealed *mild to moderate* degenerative and spondylotic
> changes from C3-4 through C6-7; multilevel degenerative stenosis from C3-4
> through C6-7; *small* disc protrusions at C3-4, C4-5 and C6-7 contributing to
> stenosis; and there was *mild* associated cord flattening at C6-7, C5-6 and to a lesser
> extent, C4-5 related to stenosis and disc protusions; there were *no* abnormal
> intramedullary signal identified to suggest myelomalacia or cord edema (Exhibit
> 2F, pp. 3-4)."

(*Id*. at 19.) (emphasis added).

Moreover, the ALJ relied on the opinion of an impartial ME, Dr. Goldhamer, in
determining the severity of Brouckaert's symptoms because "no treating or examining
physician has recorded credible findings equivalent in severity" as Brouckaert. (*Id*. at
18.)  The ALJ found that Brouckaert's alleged limitations were inconsistent with Dr.
Goldhamer's opinion regarding such limitations. (*Id.* at 20.)  Dr. Goldhamer reviewed all
the evidence in the record and opined that Brouckaert's impairments would cause the
following limitations:

> "Specifically, the claimant could lift and/or carry ten pounds frequently, twenty
> pounds occasionally; he could sit, stand and/or walk for six hours out of an
> eight-hour workday; he could frequently climb ramps and stairs; he is to never
> climb ladders, ropes or scaffolds; he can occasionally balance, crouch stoop and
> crawl; and he is to avoid extreme cold; and he is to avoid concentrated exposure to
> hazards."

(*Id.*)

Moreover, Dr. Goldhamer testified that he did not see anything in the X-rays and

1    the MRI that would keep Brouckaert from working a full-time job.  (*Id.* at 81.)  Dr.

2    Goldhamer opined that Brouckaert "could perform sustained full time work on a

3    sedentary basis."  (*Id.* at 20.)

4          The ALJ properly gave "great weight" to Dr. Goldhamer's opinion.  (*Id.* at 21.)

5    The ALJ acknowledged that the opinion of a non-examining source can never be given

6    controlling weight as it is entitled to less weight than the opinion of a treating or

7    examining source.  (*Id.* at 20.)  Nevertheless, the ALJ stated he gave such weight to Dr.

8    Goldhamer's opinion as Dr. Goldhamer is an internal medicine specialist who is well-

9    qualified to evaluate the objective evidence in the record.  (*Id.* at 20.)  Moreover, Dr.

10    Goldhamer's opinion was consistent with the medical records, which revealed that while

11    Brouckaert had spinal issues, he merely had mild to moderate range of changes in his

12    spine.  (*Id.* at 20.)  Therefore, the ALJ found Dr. Goldhamer's opinion "highly credible"

13    because it was "well-supported by the objective medical evidence" in the record.  (*Id.* at

14    21.)  Accordingly, the ALJ properly found that objective clinical and diagnostic findings

15    did not support the intensity, persistence, and limiting effects of Brouckaert's alleged

16    symptoms.

17              **iii.   Treatment Records**

18          The last basis for the ALJ's credibility determination was that Brouckaert's

19    treatment records did not support the alleged intensity, persistence, and limiting effects of

20    Brouckaert's symptoms.  (*Id.* at 19-21.)  The ALJ found that Brouckaert's symptoms can

21    be adequately controlled by medication.  (*Id.*)  Therefore, Brouckaert's symptoms cannot

22    be considered to be as severe as Brouckaert alleged them to be.  (*Id.*); *see Warre v.*

23    *Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir.2006) (holding that

24    "impairments that can be controlled effectively with medication are not disabling for the

25    purpose of determining eligibility for SSI benefits").

26          According to the medical record, Brouckaert informed Dr. Paxton on multiple

27    occasions that he was not interested in surgical or pain intervention at the cervical spine.

28    (Doc. No. 8-7 at 35, 39, 40, 44, 60, 65, 90, 96.)  Brouckaert denied surgical intervention

because his symptoms were stable on medication.  (Doc. No. 8-2 at 19); *see also Burch*, 400 F.3d at 681 (the fact that plaintiff's pain was not severe enough to motivate her to seek more aggressive treatment is "powerful evidence regarding the extent to which she was in pain").

Since the alleged disability beginning on September 21, 2010, Brouckaert has been taking pain medications – nortriptyline, hydrocodone and subsequently, morphine sulfate – to treat his degenerative disc disorder.  (Doc. No. 8-2 at 75.)  The ALJ found that on April 26, 2011, Brouckaert had normal range of motion in his lumbar spine and exhibited decreased range of motion and tenderness in his cervical spine, no spasms, and some tenderness.  (*Id*. at 19.)  Subsequently, on September 15, 2011, Brouckaert reported resolution of his radicular symptoms with medication.  (*Id.* at 20.)  Moreover, the ALJ found that on November 11, 2011, Brouckaert's physical examination was within normal limits.  (*Id.*)  During his last visit to Dr. Paxton on December 5, 2011, Brouckaert "reported cervical pain but he had *normal* range of motion and *no* tenderness; he had decreased range of motion in his lumbar spine with *no* tenderness."  (*Id.*) (emphasis added).

Moreover, the ALJ found that on December 30, 2011, Brouckaert had an MRI of the lumbar spine "which revealed *mild* diffuse degenerative and spondylotic changes; *moderate* canal stenosis and *mild* bilateral foraminal stenosis at L2-3, L3-4 and L4-5; and there was underlying congenital canal narrowing contributing to the aforementioned stenosis."  (*Id.*) (emphasis added).  Accordingly, Brouckaert's symptoms were stable on medication.  (*Id.* at 19.)  Thus, the ALJ properly found that Brouckaert's treatment records did not support the intensity, persistence and limiting effects of Brouckaert's alleged symptoms.

## VI.  CONCLUSION

The Court finds that there is sufficient basis for the ALJ's conclusion to discredit Brouckaert's pain testimony.  The ALJ's decision properly set forth "specific, clear and convincing" reasons supported by substantial evidence in the record to properly discredit

1   Brouckaert's subjective pain testimony.

2       Having reviewed the matter, the undersigned Magistrate Judge recommends that

3   Brouckaert's motion for summary judgment be **DENIED** and that Commissioner's

4   cross-motion for summary judgment be **GRANTED**.  This Report and Recommendation

5   of the undersigned Magistrate Judge is submitted to the United States District Judge

6   assigned to this case, pursuant to 28 U.S.C. § 636(b)(1).

7       **IT IS ORDERED** that no later than **July 25, 2014**, any party to this action may

8   file written objections with the Court and serve a copy to all parties.  The document

9   should be captioned "Objections to Report and Recommendation."

10      **IT IS FURTHER ORDERED** that any reply to the objections shall be filed with

11  the Court and served on all parties no later than **August 1, 2014.**

12   DATED:  July 10, 2014

13

14

15                              Hon. Bernard G. Skomal
                                U.S. Magistrate Judge
16                              United States District Court

17

18

19

20

21

22

23

24

25

26

27

28

23